UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

OPPENHEIMER & CO. INC.,

                Plaintiff,

                        :    Index No. 08-Civ.-3697 (LTS)(FM)

    - against -

                        :    **PRELIMINARY PRE-TRIAL**
METAL MANAGEMENT, INC.,         **STATEMENT**

                Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

         Pursuant to the Court's Orders of April 30, 2008 and June 16, 2008 as well as Fed.

R. Civ. P. 26(f) Plaintiff Oppenheimer & Co. Inc. ("Plaintiff" or "Oppenheimer") and Defendant

Metal Management, Inc. ("Defendant" or "Metal Management") (together, the "Parties") file this

Preliminary Pre-Trial Statement:

## A.    Nature of the Action

         This is an action for alleged breach of contract brought by Oppenheimer against Metal

Management.  Oppenheimer alleges that Metal Management owes it a transaction fee in the

amount of $8,023,262 pursuant to a Letter Agreement ("Letter Agreement") originally entered

into between Metal Management and CIBC World Markets, Corp. ("CIBC") by which Metal

Management engaged CIBC to perform services as set forth therein in connection with a

potential transaction.  For the Court's reference, a true and correct copy of the Letter Agreement

is annexed hereto as Exhibit A.

         Oppenheimer contends that CIBC has assigned its right to payment of any fees due under

the Letter Agreement to Oppenheimer.  Oppenheimer further contends that a transaction fee in

the amount of $8,023,262 became due and owing under the Letter Agreement when, on March

1

14, 2008, Metal Management consummated a merger with Sims Group Ltd. ("Sims").
Oppenheimer further asserts that it is entitled to recover reimbursement of CIBC's expenses,
including fees of its legal counsel, incurred in rendering its services under the Letter Agreement
as well as reimbursement of Oppenheimer's costs and expenses, including fees of its legal
counsel, in enforcing the Letter Agreement.

Metal Management contends that it does not owe any amount to Oppenheimer. Metal
Management further contends that CIBC breached the Letter Agreement by failing to fulfill its
obligations pursuant to its terms. Metal Management asserts that it did not receive the benefits
for which it contracted under the Letter Agreement. In addition, Metal Management asserts that
CIBC's duties and obligations under the Letter Agreement were neither assignable nor delegable.
Metal Management further asserts that the Letter Agreement does not provide for the shifting of
attorneys' fees.

**B.    Jurisdiction**

The Parties agree that this Court has subject matter jurisdiction under 28 U.S.C. § 1332
based on diversity of citizenship among the parties in that the sole defendant in this action is
diverse in citizenship from the plaintiff, and the amount in controversy exceeds $75,000,
exclusive of interest and costs.

**C.    Material Uncontested or Admitted Facts**

1.    Oppenheimer is a New York corporation with is principal offices located at 125
Broad Street, 16th Floor, New York, New York 10004.

2.    Metal Management is a Delaware corporation with its principal offices located at
325 North LaSalle Street, Suite 550, Chicago, Illinois 60611.

2

3.    In or about April 2007, CIBC began performing work on behalf of Metal

Management in connection with a possible transaction between Metal Management and Sims.

4.    In or about April 2007, Metal Management was one of the largest full-service

metal recyclers in the United States and Sims, an Australian corporation, was one of the world's

largest metals recycling companies.

5.    Metal Management and CIBC entered into the Letter Agreement as of August 1,

2007, which stated:

> This letter agreement confirms our understanding of the engagement of CIBC
> World Markets Corp. ("CIBC World Markets") by Metal Management, Inc.
> ("Metal Management"), and together with its subsidiaries and affiliates, the
> "Company") to act as exclusive financial advisor to the Company in connection
> with a possible (a) merger or other business combination, whether in one or a
> series of transactions including without limitation, a forward or reverse triangular
> merger, involving Metal Management or (b) sale or other transfer, directly or
> indirectly and whether in one or a series of related transactions, of all or
> substantially all of the assets or securities of Metal Management, regardless of the
> form or structure of such transaction (each such transaction being referred to
> herein as the "Transaction").

6.    The Letter Agreement provided that CIBC was to provide services to Metal

Management as follows:

> *Services*:  CIBC World Markets will provide you with financial advice and
> assistance in connection with the Transaction, which may involve, to the extent
> requested by you and appropriate for the Transaction, advice and assistance in
> connection with defining strategic and financial objectives, assisting in the
> preparation of a confidential memorandum describing the Company, roadshow or
> other marketing materials and related materials for distribution to such parties
> reviewing financial information and assisting in negotiations of the financial
> terms and structure of the Transaction and providing capital and currency market
> advice as it relates to the Transaction. If requested by the Board of Directors or a
> Special Committee of the Board (if so constituted), we also will render an opinion
> as to the fairness, from a financial point of view, to the Company or its
> shareholders of the consideration to be paid or received by the Company in
> connection with a Transaction (or, in the case of a Transaction involving an
> exchange of securities, the exchange ratio) (the "Opinion"), subject to the
> approval of CIBC World Markets' M&A committee.  CIBC World Markets
> consents to the inclusion of (i) the Opinion in its entirety and reference to such
> Opinion in any prospectus or proxy statement required to be distributed to the

3

Company's shareholders in connection with a Transaction and (ii) a summary of such Opinion in any such prospectus or proxy statement so long as such summary is in form and substance acceptable to CIBC World Markets and its counsel. . . . If you should request us to provide additional services not otherwise contemplated by this letter agreement, the Company and CIBC World Markets will enter into an additional letter agreement which will set forth the nature and scope of the services, appropriate compensation and other customary matters, as mutually agreed upon by the Company and CIBC World Markets.

7.    The Letter Agreement sets forth the fees for the Services as defined therein as

follows:

*Compensation:* in connection with this engagement, the Company agrees to pay us (a) an engagement fee of $50,000, payable cash upon execution of this letter agreement, plus (b) if the Company requests that CIBC World Markets provide an Opinion, the Company agrees to pay CIBC World Markets an opinion fee of $750,000, payable in cash upon the earlier of oral or written delivery of an Opinion, plus (c) a transaction fee equal to 0.50% of Transaction Value (as defined below), payable in cash on the closing date of each Transaction if, during this engagement or within nine (9) months thereafter, a Transaction is consummated or an agreement is entered into that subsequently results in a Transaction. If a Transaction is not consummated, but the Company receives a "break-up" fee or any other payment as a result of the termination of the Transaction or realizes any profits from the exercise of any options or warrants granted to the Company in connection with the Transaction, then the Company will pay to CIBC World Markets a fee equal to 10% of such fee, profit or payment, payable in cash when any such amount is paid to the Company or any such option or warrant exercised.

8.    The Letter Agreement also sets forth the terms for reimbursement of reasonable

and documented expenses:

The Company also agrees to periodically reimburse CIBC World Markets promptly when invoiced for all of its reasonable and documented expenses (including reasonable and documented fees and expenses of its legal counsel) in connection with the performance of its services hereunder, regardless of whether a Transaction occurs; provided that, except as otherwise contemplated by Annex A hereto, expenses in excess of $75,000 will require the consent of the Company (which consent will not be unreasonably withheld). Upon termination of this letter agreement or completion of a Transaction, the Company agrees to pay promptly in cash any reasonable and document (sic) expenses that have accrued as of such date and are unreimbursable per the terms hereof.

9.    The Letter Agreement provides for indemnification as follows:

*Indemnification.* As CIBC World Markets will be acting on your behalf, you agree to indemnify CIBC World markets and certain related parties in the manner set forth in Annex A which is attached and incorporated by reference in its entirety to this letter agreement, the provisions of which are hereby acknowledged by the Company.

10.    Annex A to the Letter Agreement provides:

The Company agrees to indemnify and hold harmless CIBC World Markets and its affiliates and their respective present and former directors, officers, employees, agents and controlling persons (each such person, including CIBC World Markets, an "Indemnified Party") to the extent fully permitted by law from and against any losses, claims, damages and liabilities, joint or several (collectively, the "Damages"), to which such Indemnified Party may become subject in connection with or otherwise relating to or arising from any transaction contemplated by this letter agreement or the engagement of or performance of services by an Indemnified Party thereunder, and will reimburse each Indemnified Party for all fees and expenses (including the fees and expenses of counsel) (collectively, "Expenses") as incurred in connection with investigating, preparing, pursuing or defending any threatened or pending claim, action, proceeding or investigation (collectively, "Proceedings") arising therefrom, whether or not such Indemnified Party is a formal party to such Proceeding, and in enforcing this letter agreement; provided, that the Company will not be liable to any such Indemnified Party to the extent that any Damages are found in a final non-appealable judgment by a court of competent jurisdiction to have resulted primarily from the gross negligence, bad faith or willful misconduct of the Indemnified Party seeking indemnification hereunder.  The Company also agrees that no Indemnified Party will have any liability (whether direct or indirect, in contract, tort or otherwise) to the Company or any person asserting claims on behalf of the Company arising out of or in connection with any transactions contemplated by this letter agreement or the engagement of or performance of services by any Indemnified Party thereunder expect to the extent that any Damages are found in a final non-appealable judgment by a court of competent jurisdiction to have resulted primarily from the gross negligence, bad faith or willful misconduct of the Indemnified Party.

If for any reason other than in accordance with this letter agreement, the foregoing indemnity is unavailable to an Indemnified Party or insufficient to hold an Indemnified Party harmless, then the Company will contribute to the amount paid or payable by an Indemnified Party as a result of such Damages (including all Expenses incurred) in such proportion as is appropriate to reflect on the relative benefits to the Company and/or its stockholders on the one hand, and CIBC World Markets on the other hand, in connection with the matters covered by this letter agreement, or if the foregoing allocation is not permitted by applicable law, not only such relative benefits but also the relative faults of such parties as well as any relevant equitable considerations. The Company agrees that for purposes of this paragraph the relative benefits to the Company and/or its stockholders and

CIBC World Markets in connection with the matters covered by this letter agreement will be deemed to be in the same proportion that the total value paid or received to be paid or received by the Company and/or its stockholders in connection with the transactions contemplated by this letter agreement, whether or not consummated, bears to the fees paid to CIBC World Markets under this letter agreement; provided, that in no event will the total contribution of all Indemnified Parties to all such Damages exceed the amount of fees actually received and retained by CIBC World Markets  under this letter agreement (excluding any amounts received by CIBC World Markets as reimbursement of expenses).  Relative Fault shall be determined by reference to, among other things, whether any alleged untrue statement or omission or any alleged conduct relates to information provided by the Company or other conduct by the Company (or its employees or other agents) on the one hand, or by CIBC World Markets, on the other hand.

The Company agrees not to enter into any waiver, release or settlement of any Proceeding (whether or not CIBC World Markets or any other Indemnified Party is a formal party to such Proceeding) in respect of which indemnification may be sought hereunder without the prior written consent of CIBC World Markets (which consent will not be unreasonably withheld), unless such waiver, release or settlement (i) includes an unconditional release of CIBC World Markets and each Indemnified Party from all liability arising out of such Proceeding and (ii) does not contain any factual or legal admission by or with respect to any Indemnified Party or any adverse statement with respect to the character, professionalism, expertise or reputation of any Indemnified Party or any action or inaction of any Indemnified Party.

The indemnity, reimbursement or contribution obligations of the Company hereunder will be in addition to any liability which the Company may have at common law or otherwise to any Indemnified Party and will be binding upon and inure to the benefit of any successors, assigns, heirs and personal representatives of the Company or an Indemnified Party.  The provisions of this Annex will survive the modification or termination of this letter agreement.

11.    The Letter Agreement provides as follows concerning its term:

*Term:*  This engagement will commence on the date of this letter agreement and terminate 30 days from the date on which a party receives written notice from the other party of termination of this agreement.  Notwithstanding the foregoing sentence, and subject to the terms and conditions set forth in this letter agreement, the Company agrees that the provisions relating to the payment of fees, reimbursement of expenses, indemnification and contribution, independent contractors, conflicts, confidentiality and waiver of the right to trial by jury will survive any such termination.

12.    The Letter Agreement further states:

6

This letter agreement may not be amended or modified except in writing signed by the Company and CIBC World Markets and may be executed in two or more counterparts, each of which will be deemed to be an original, but all of which will constitute one and the same agreement. All rights, liabilities and obligations hereunder will be binding upon and inure to the benefit of the Company, CIBC World Markets, each Indemnified Party (as defined in Annex A) and their respective successors and assigns.

13.     Following the execution of the Letter Agreement, CIBC continued to perform the

services contemplated therein up to September 24, 2007, on which date CIBC delivered the

opinion letter.

14.     On September 24, 2007, by unanimous vote, the Metal Management board of

directors approved the transactions contemplated by the merger agreement with Sims. The

merger agreement between Sims and Metal Management was entered into as of September 24,

2007. Pursuant to the merger agreement, Sims agreed, among other things, to exchange 2.05

Sims American Depositary Shares ("ADS") for each share of Metal Management common stock.

Each Sims ADS represents one ordinary share of Sims stock.

15.     On March 14, 2008, Metal Management announced that its shareholders had

approved the adoption of the merger agreement with Sims at a special shareholders' meeting and

that the merger with Sims became effective the same day.

16.     The Letter Agreement defines Transaction Value as:

[T]he total value of all consideration (including cash, securities or other property) paid or received or to be paid or received, directly or indirectly, in connection with a Transaction in respect of assets or outstanding securities on a fully diluted basis (treating any securities issuable upon the exercise of options, warrants or other convertible securities and any securities to be redeemed as outstanding, whether or not vested, provided, however, that options and warrants will calculated [sic] at their net exercise value), plus the principal amount of any bank debt outstanding as of the closing date of a Transaction or directly or indirectly assumed, refinanced or extinguished in connection with a Transaction. If any portion of Transaction Value is payable in the form of securities, the value of such securities, for purposes of calculating our transaction fee, will be determined based on the average closing price for such securities for the 10 trading days prior to the closing of the Transaction. . . .

7

17.     According to this formula, the Sims merger valued Metal Management at approximately $1,604,700,000 and a transaction fee based on the valuation of Metal Management in the Sims merger, if earned, would be $8,023,262.

18.     Metal Management has paid the engagement fee in the amount of $50,000 and the opinion fee in the amount of $750,000.

**D.     Uncontested Legal Issues**

1.     This dispute is governed by New York law.

2.     In executing the Letter Agreement CIBC and Metal Management entered into a valid and binding agreement.

3.     The right to receive payment under a contract is freely assignable.

4.     Metal Management's merger with Sims constituted a Transaction, as defined by the Letter Agreement.

**E.     Legal Issues to Be Decided by the Court**

1.     Whether Metal Management was excused from further performance of its obligations under the Letter Agreement by virtue of CIBC's alleged material breach of the Letter Agreement.

2.     Did Metal Management breach the Letter Agreement by not paying the transaction fee?

3.     Did CIBC breach the Letter Agreement by failing to provide Metal Management with reasonable assurances that it would perform under the Letter Agreement following Metal Management's request for such assurances?

8

4.    Did CIBC breach the Letter Agreement by virtue of non-performance of Services as defined in the Letter Agreement?

5.    Did Metal Management receive the benefits contracted for in the Letter Agreement?

6.    Were CIBC's duties and obligations under the Letter Agreement assignable?

7.    Were CIBC's duties and obligations under the Letter Agreement delegable?

8.    Does the indemnification provision contained in the Letter Agreement provide for attorneys' fee shifting?

9.    Has Plaintiff failed to join a party under Rule 19, i.e., CIBC?

**F.    Material Disputed Facts**

1.    Plaintiff's Statement

(a)    It is Plaintiff's position that there are no material facts in dispute. All conditions precedent to payment of the transaction fee under the Letter Agreement have occurred and the transaction fee is now due and owing. However, because Defendant refuses to admit certain facts, which Plaintiff believes are not reasonably subject to dispute, the following additional facts are provided below.

(b)    In connection with the Sims merger, Metal Management filed with the United States Securities and Exchange Commission ("SEC") a registration statement dated November 28, 2007, an amended registration statement dated January 17, 2008, a second amended registration statement dated February 8, 2008 (together, the "Registration Statements"), and a proxy statement dated February 12, 2008 (the "Proxy Statement") (together, the "Metal Management SEC Filings").

9

Defendant has admitted in its Answer to Plaintiff's Complaint "that the statements

contained in the Proxy Statement were true and accurate as of February 12, 2008,

and as of March 14, 2008."

(c)     The Metal Management SEC Filings, among other things, each state that Metal

Management's board of directors requested and received a fairness opinion from

CIBC on the date it unanimously approved the Sims merger agreement:

Metal Management has engaged CIBC World Markets as its financial
advisor in connection with the merger.  In connection with this
engagement, the Metal Management board of directors requested that
CIBC World Markets evaluate the fairness, from a financial point of view,
to the holders of Metal Management common stock of the exchange ratio
provided for in the merger. On September 24, 2007, at a meeting of the
Metal Management board of directors held to evaluate the merger, CIBC
World Markets rendered to the Metal Management board of directors an
oral opinion, which was confirmed by delivery of a written opinion, dated
September 24, 2007, to the effect that, as of that date and based on and
subject to the matters described in its opinion, the exchange ratio was fair,
from a financial point of view, to the holders of Metal Management
common stock.

The opinion letter's text was substantially reproduced in the Metal Management

SEC Filings and attached in full as an appendix.

(d)     The Metal Management SEC Filings further stated the following:

Metal Management has agreed to pay CIBC World Markets for its
financial advisory services in connection with the merger an aggregate fee
estimated to be approximately $8.8 million, a portion of which was
payable in connection with CIBC World Markets' engagement, a portion
of which was payable upon delivery of its opinion and approximately $8
million of which is contingent upon consummation of the merger.  In
addition, Metal Management has agreed to reimburse CIBC World
Markets for its reasonable expenses, including reasonable fees and
expenses of its legal counsel. . . .

10

(e) As acknowledged and described by the Metal Management SEC Filings, starting on or around April 28, 2007, CIBC acted as Metal Management's financial advisor in connection with a potential transaction between Metal Management and Sims. Among other things, CIBC advised Metal Management and its board of directors regarding the terms of the various proposed transactions, including a fairness opinion on which Metal Management's board of directors relied in unanimously approving the Sims merger agreement, attended meetings with representatives of both parties and engaged in negotiations, on Metal Management's behalf, with Sims's financial advisor regarding the potential transaction. The Metal Management SEC Filings accurately describe CIBC's involvement in the events leading up to the execution of the merger agreement with Sims.

(f) Defendant never provided Plaintiff or CIBC with any notice of a material breach of the Letter Agreement.

(g) Defendant never provided Plaintiff or CIBC with written notice of termination pursuant to the Letter Agreement.

2. Defendant's Statement

(a) It is Metal Management's position that there are a number of material facts in dispute. Metal Management contends that it did not receive the performance it contracted for under the Letter Agreement. Metal Management contends that all conditions precedent to payment of the transaction fee under the Letter Agreement did not occur. Metal Management states that CIBC repudiated the

11

Letter Agreement by not providing adequate assurances when requested. Metal
Management states that the Letter Agreement was neither delegable nor
assignable. Metal Management states that the Letter Agreement does not provide
for the shifting of attorneys' fees.

(b)     Metal Management contends that the SEC filings referred to by Plaintiff above,
are not relevant to any issue in this action.

(c)     Metal Management asserts that the Letter Agreement does not require that any
notice be sent by the non-breaching party to the breaching party in the event of a
breach of the Letter Agreement.


## G.      Plaintiff's Legal Basis of Each Cause of Action Asserted

1.      In this breach of contract action against Metal Management, Oppenheimer seeks
payment of fees and expenses, as well as its costs in bringing this action.

2.      Success fees, such as the transaction fee under the Letter Agreement, are common
for financial advisory services agreements, Lazard Freres & Co. v. Crown Sterling Mgmt., Inc.,
901 F. Supp. 133, 137 (S.D.N.Y. 1995) ("Such clauses are common."), and courts in this District
have routinely enforced such provisions and found their terms to be unambiguous as a matter of
law, PaineWebber Inc. v. Campeau Corp., 670 F. Supp. 100, 105 (S.D.N.Y. 1987), CIBC World
Mkts. Corp. v. Techtrader, Inc., 183 F. Supp. 2d 605, 612 (S.D.N.Y. 2001).

3.      Success fees that are conditioned on the occurrence of a future event, such as the
consummation of a transaction, are regularly enforced, without more, when the contemplated
transaction is consummated. Lazard Freres & Co. v. Crown Sterling Mgmt., Inc., 901 F. Supp.

133, 137 (S.D.N.Y. 1995); CIBC World Mkts. Corp. v. Techtrader, Inc., 183 F. Supp. 2d 605,

610-12 (S.D.N.Y. 2001); PaineWebber Inc. v. Campeau Corp., 670 F. Supp. 100, 105-06

(S.D.N.Y. 1987); Chase Manhatten Bank, N.A. v. Remington Prods., Inc., 865 F. Supp. 194, 199

(S.D.N.Y. 1994), aff'd, 71 F.3d 407 (2d Cir. 1995); BNY Capital Mkts., Inc. v. Moltech Corp.,

No. 99 Civ. 11754 (GEL), 2001 WL 262675, at *7 (S.D.N.Y. Mar. 14, 2001); see also

Rothschild Inc. v. Telergy, Inc., 270 A.D.2d 148, 149 (1st Dep't 2000).

4.      Under New York law, a provision in a financial advisory services agreement that

provides for reimbursement of expenses incurred in rendering the services contemplated by the

agreement is enforceable.  BNY Capital Mkts., Inc. v. Moltech Corp., No. 99 Civ. 11754 (GEL),

2001 WL 262675, at *5, *12 (S.D.N.Y. Mar. 14, 2001); CIBC World Mkts. Corp. v. Techtrader,

Inc., 183 F. Supp. 2d 605, 610, 612 (S.D.N.Y. 2001).

5.      Under New York law, a provision in a letter agreement for investment banking

services indemnifying a contracting party for all costs, including attorneys' fees, incurred in

enforcing the contract is enforceable.  BNY Capital Mkts., Inc. v. Moltech Corp., 2001 WL

262675, at *4, *6, *12 (S.D.N.Y. Mar. 14, 2001).

6.      Additionally, none of Defendant's defenses alleged in its Answer and below

would provide a basis for excuse of payment of the transaction fee.  Neither in its Answer nor in

its statements of supposedly disputed facts has Defendant specified any condition precedent to

the payment of the transaction fee that was not met.  In any event, because Defendant continued

to accept the benefits under the Letter Agreement long after the alleged breaches purportedly

occurred, failed to give notice of any alleged material breach and failed to terminate the Letter

Agreement, Defendant cannot now claim that it is excused from paying the transaction fee.

Lazard Freres & Co. v. Crown Sterling Mgmt., Inc., 901 F. Supp. 133, 136-37 (S.D.N.Y. 1995);

13

BNY Capital Mkts., Inc. v. Moltech Corp., No. 99 Civ. 11754 (GEL), 2001 WL 262675, at *6-7 (S.D.N.Y. Mar. 14, 2001); PaineWebber Inc. v. Campeau Corp., 670 F. Supp. 100, 105-06 (S.D.N.Y. 1987).

## H.    Defendant's Legal Bases for Its Defenses

1.    Plaintiff's claim for breach of the Letter Agreement fails because the Letter Agreement was materially breached by non-performance. See e.g., Roundout Valley Central School Dist. v. The Coneco Corp., et al., 339 F. Supp. 2d 425, 437 (N.D.N.Y. 2004); Schwasnick v. Blandin, et al., 65 F. 2d 354 (2d Cir. 1933); Bear Stearns Funding, Inc. v. Interface Group-- Nevada, Inc., 361 F. Supp. 2d 283, 290-92 (S.D.N.Y. 2005); New Windsor Volunteer Ambulance Corps, Inc. v. Meyers, 442 F. 3d 101, 117 (2d Cir. 2006); Wells Fargo Financial, Inc. v. Fernandez, 2000 U.S. Dist. LEXIS 17002 * 3 (S.D.N.Y. 2000); Mackinder v. Schawk, 2005 U.S. Dist. LEXIS 15880* 17-21 (S.D.N.Y. 2005); Fed. Deposit Ins. Corp. v. Berstein, et al., 786 F. Supp. 170, 180 (E.D.N.Y. 1992).

2.    CIBC repudiated the Letter Agreement by not providing assurances to Metal Management upon request for reasonable assurances.  See e.g., Marvel Entertainment Group, Inc. v. ARP Films, Inc.  684 F. Supp. 818, 820-21 (S.D.N.Y. 1988); In re Asia Global Crossing, Ltd., 332 B.R. 520, 525 (Bankr. S.D.N.Y. 2005).

3.    Plaintiff's claim fails for failure of consideration. See e.g., First Fed. Sav. Bank (of Delaware) v. Nomura Sec. Int'l., Inc., 1995 U.S. Dist. LEXIS 4770 *12 (S.D.N.Y. 1995); Apfel v. Prudential-Bache Sec., Inc., 81 N.Y. 2d 470, 475-76 (N.Y. 1993).

4.    Plaintiff's claim fails to the extent Plaintiff has waived, or is estopped from asserting, such causes of action. See e.g., Int'l. Minerals & Res. S.A. et al v. Pappas, 96 F. 3d 586, 594 (2d Cir. 1996); Onanuga v. Pfizer, Inc., 369 F. Supp. 2d 491, 498 (S.D.N.Y. 2005).

14

5.      The Letter Agreement between Metal Management and CIBC was not delegable.
See e.g., In re Mitchell, 249 B.R. 55 (Bankr. S.D.N.Y. 2000); In re Schick, 235 B.R. 318 (Bankr.
S.D.N.Y. 1999); Wang v. Chen, 1992 U.S. Dist. LEXIS 299, 1992 WL 7840 (S.D.N.Y. Jan. 10,
1992).

6.      The Letter Agreement between Metal Management and CIBC was not assignable.
See e.g., Creator's Way Associated Labels, Inc. v. Mitchell, 249 B.R. 55, 58 (Bankr. S.D.N.Y.
2000); In re Compass Van & Storage Corp., 65 B.R. 1007, 1010 (Bankr. E.D.N.Y. 1986);
Preferred Oncology Networks of Am. Inc., v. Bottino, 1997 U.S. Dist. LEXIS 7607 *5-7
(S.D.N.Y. 1997); N.Y. Bank & Notes Co. v. Hamilton Bank & Note Engraving & Printing Co.,
180 N.Y. 280, 293 (1905).

7.      Plaintiff is not entitled to counsel fees and expenses for the instant action pursuant
to the indemnification annex in the Letter Agreement.  See, e.g., Hooper Associates, Ltd. v. AGS
Computers, Inc., 74 N.Y. 2d 487, 490 (N.Y. 1989); Bourne v. MPL Communications, Inc., 751 F.
Supp. 55, 57 (S.D.N.Y. 1990); Technoclima, S.p.A. v. PJC Group of New York, 1995 U.S. Dist.
Lexis 9139 *2 (S.D.N.Y. 1995).

8.      Plaintiff has failed to join a Rule 19 party. See e.g., Fed. R. Civ. P. 19(a).

## I.      Measure of Proof and on Whom the Burden of Proof Falls as to Each Cause or Defense

In this breach of contract action Oppenheimer has the burden of establishing the
execution of the Letter Agreement and its terms and the valid assignment of CIBC's rights under
the Letter Agreement to Oppenheimer.  The burden of proof is by a preponderance of the
evidence.

Metal Management asserts that Plaintiff also has the burden of proving performance of the Letter Agreement and damages by a preponderance of the evidence.

Metal Management has the burden of establishing its affirmative defenses by a preponderance of the evidence.

**J.      Pleading Amendment and Additional Parties**

The deadline for moving to amend the pleadings or joining additional parties is October 22, 2008.

**K.      Trial Before a Magistrate Judge**

The Parties have considered, but do not consent to a trial before a Magistrate Judge at this time.

**L.      Disclosures under Fed.R.Civ.P. 26(a)**

The Parties agree that the disclosures required under Fed. R. Civ. P. 26(a) should be made by the parties on or before September 17, 2008.

**M.      Subjects of Disclosure and Proposed Discovery Cut-Off**

1.      The Parties agree that, to the extent discovery is required, it should include the following subjects:

(a)      The terms of the Letter Agreement and other contracts governing the relationship between the Parties.

(b)      The negotiation of the Letter Agreement.

(c)     The communications and data of key individuals involved in the Metal

Management-Sims merger on behalf of Metal Management on the one hand and CIBC on the

other.

(d)     The purported assignment of the Letter Agreement to Oppenheimer.

(e)     The nonperformance or performance of the Letter Agreement by CIBC and/or

Oppenheimer.

2.      Defendant asserts, but Plaintiff does not agree, that it is entitled to discovery on

the following subjects:

(a)     Oppenheimer's experience in the field of recycled metals.

(b)     The delegation of the Letter Agreement to Oppenheimer.

(c)     The experience of Mark Henkels and his group at CIBC in the field of recycled

metals.

3.      The Parties agree that discovery should be completed by February 23, 2008.

## N.     Expert Evidence

The Parties agree that the expert designations and disclosures required pursuant to Rule

26(a)(2) should be made on or before March 23, 2009.  Expert discovery, including depositions

of experts, should be completed on or before May 6, 2009.

## O.     Limitations on Discovery

At this time, neither party requests any changes to the discovery limitations otherwise

applicable under the Rules of Federal Procedure and the Local Rules of this Court.

17

**P.      Status of Settlement Discussions**

The Parties have discussed settlement, but have different views of their exposure in this

case.

**Q.      Bench Trial, Duration of Trial**

Under the Letter Agreement, the Parties have "waive[d] any right . . . to a trial by jury."

Should this case go to trial, the parties expect it to last no more than 5 days.

**R.      Other Orders Under Fed.R.Civ.P. 26(c) or Fed.R.Civ.P. 16(b) and (c)**

The Parties are not aware of any order that needs to be entered by the Court under Fed. R.

Civ. P. 26(c), 16(b) or (c) at this time.

**S.      Reservation**

The Parties respectfully reserve their right to amend the statements of their contentions in

light of the facts that may be adduced at a later date.

Dated:        August 15, 2008

                            Respectfully submitted,

                            Christopher P. Malloy (CM 6989)
                            SKADDEN, ARPS, SLATE, MEAGHER
                             & FLOM LLP
                            Four Times Square
                            New York, New York 10036
                            (212) 735-3000

                            Attorneys for Plaintiff
                            Oppenheimer & Co. Inc.

18

_(Beth G. Olivia B0-5731)_
_on behalf_

Keelin Kavanagh (KK-2188)
JACOB, MEDINGER & FINNEGAN, LLP _Keelin_
1270 Avenue of the Americas _Kavanagh_
New York, New York 10020
(212) 524-5000

Attorneys for Defendant
Metal Management, Inc.

19

# EX A



CIBC
World Markets

300 Madison Avenue
New York, NY 10017

As of August 1, 2007

<u>PERSONAL AND CONFIDENTIAL</u>

Metal Management, Inc.
325 N. LaSalle Street, Suite 550
Chicago, IL 60610

Attention:    Daniel W. Dienst
President & CEO

Ladies and Gentlemen:

This letter agreement confirms our understanding of the engagement of CIBC World Markets Corp. ("CIBC World Markets") by Metal Management, Inc. ("Metal Management", and together with its subsidiaries and affiliates, the "Company") to act as exclusive financial advisor to the Company in connection with a possible (a) merger or other business combination, whether in one or a series of transactions and including without limitation, a forward or reverse triangular merger, involving Metal Management or (b) sale or other transfer, directly or indirectly and whether in one or a series of related transactions, of all or substantially all of the assets or securities of Metal Management, regardless of the form or structure of such transaction (each such transaction being referred to herein as the "Transaction").

<u>Services</u>.  CIBC World Markets will provide you with financial advice and assistance in connection with the Transaction, which may involve, to the extent requested by you and appropriate for the Transaction, advice and assistance in connection with defining strategic and financial objectives, assisting in the preparation of a confidential memorandum describing the Company, roadshow or other marketing materials and related materials for distribution to such parties reviewing financial information and assisting in negotiations of the financial terms and structure of the Transaction and providing capital and currency market advice as it relates to the Transaction.  If requested by the Board of Directors or a Special Committee of the Board (if so constituted), we also will render an opinion as to the fairness, from a financial point of view, to the Company or its shareholders of the consideration to be paid or received by the Company in connection with a Transaction (or, in the case of a Transaction involving an exchange of securities, the exchange ratio) (the "Opinion"), subject to the approval of CIBC World Markets' M&A Committee.  CIBC World Markets consents to the inclusion of (i) the Opinion in its entirety and reference to such Opinion in any prospectus or proxy statement required to be

distributed to the Company's shareholders in connection with a Transaction and (ii) a summary of such Opinion in any such prospectus or proxy statement so long as such summary is in form and substance acceptable to CIBC World Markets and its counsel. It is understood and agreed that CIBC World Markets' services hereunder will not include providing any legal, regulatory, accounting or tax advice or developing any tax strategies for the Company. If you should request us to provide additional services not otherwise contemplated by this letter agreement, the Company and CIBC World Markets will enter into an additional letter agreement which will set forth the nature and scope of the services, appropriate compensation and other customary matters, as mutually agreed upon by the Company and CIBC World Markets.

*Compensation.* In connection with this engagement, the Company agrees to pay us (a) an engagement fee of $50,000, payable in cash upon execution of this letter agreement, plus (b) if the Company requests that CIBC World Markets provide an Opinion, the Company agrees to pay CIBC World Markets an opinion fee of $750,000, payable in cash upon the earlier of oral or written delivery of an Opinion, plus (c) a transaction fee equal to 0.50% of Transaction Value (as defined below) , payable in cash on the closing date of each Transaction if, during this engagement or within nine (9) months thereafter, a Transaction is consummated or an agreement is entered into that subsequently results in a Transaction. If a Transaction is not consummated, but the Company receives a "break-up" fee or any other payment as a result of the termination of the Transaction or realizes any profits from the exercise of any options or warrants granted to the Company in connection with a Transaction, then the Company will pay to CIBC World Markets a fee equal to 10% of such fee, profit or other payment, payable in cash when any such amount is paid to the Company or any such option or warrant is exercised.

As used in this letter agreement, "Transaction Value" means the total value of all consideration (including cash, securities or other property) paid or received or to be paid or received, directly or indirectly, in connection with a Transaction in respect of assets or outstanding securities on a fully diluted basis (treating any securities issuable upon the exercise of options, warrants or other convertible securities and any securities to be redeemed as outstanding, whether or not vested, provided, however, that options and warrants will calculated at their net exercise value), plus the principal amount of any bank debt outstanding as of the closing date of a Transaction or directly or indirectly assumed, refinanced or extinguished in connection with a Transaction. If any portion of Transaction Value is payable in the form of securities, the value of such securities, for purposes of calculating our transaction fee, will be determined based on the average closing price for such securities for the 10 trading days prior to the closing of the Transaction. In the case of securities that do not have an existing public market, our Transaction Fee will be determined based on the fair market value of such securities as mutually agreed upon in good faith by the Company and CIBC World Markets prior to the closing of the Transaction. Fees on amounts paid into escrow will be payable upon the establishment of such escrow. Fees relating to contingent payments other than escrowed amounts will be payable upon receipt of such funds by the Company.

The Company also agrees to periodically reimburse CIBC World Markets promptly when invoiced for all of its reasonable and documented expenses (including reasonable and documented fees and expenses of its legal counsel) in connection with the performance of its services hereunder, regardless of whether a Transaction occurs; provided that, except as otherwise contemplated by Annex A hereto, expenses in excess of $75,000 will require the consent of the Company (which consent will not be unreasonably withheld). Upon termination of this letter agreement or completion of a Transaction, the Company agrees to pay promptly in cash any reasonable and document expenses that have accrued as of such date and are unreimbursable per the terms hereof.

*Term.* This engagement will commence on the date of this letter agreement and terminate 30 days from the date on which a party receives written notice from the other party of termination of this engagement. Notwithstanding the foregoing sentence, and subject to the terms and conditions set forth in this letter agreement, the Company agrees that the provisions relating to the payment of fees, reimbursement of expenses, indemnification and contribution, independent contractors, conflicts, confidentiality and waiver of the right to trial by jury will survive any such termination.

*Indemnification.* As CIBC World Markets will be acting on your behalf, you agree to indemnify CIBC World Markets and certain related parties in the manner set forth in Annex A which is attached and incorporated by reference in its entirety to this letter agreement, the provisions of which are hereby acknowledged by the Company.

*Use of Information.* The Company will furnish (or will use its best efforts to cause potential third parties to furnish) to CIBC World Markets such information as CIBC World Markets requests for purposes of performing services under this letter agreement (the "Information"). The Company hereby agrees and represents that all Information relating to the Company furnished to CIBC World Markets will be accurate and complete in all material respects at the time provided, and that, if the Company is aware of any Information becoming materially inaccurate, incomplete or misleading during the engagement hereunder, the Company will promptly advise CIBC World Markets. The Company recognizes and confirms that CIBC World Markets assumes no responsibility for the accuracy and completeness of the Information (including information available from generally recognized public sources) and will be using and relying on the Information (and information available from generally recognized public sources) without assuming responsibility for independent verification or independent evaluation of any of the assets or liabilities (contingent or otherwise) of the Company or the third party.

*Independent Contractor.* The Company acknowledges that in performing its services, CIBC World Markets is acting as an independent contractor, and not as a fiduciary, agent or otherwise, to the Company or any other person. The Company acknowledges that in performing its services hereunder, CIBC World Markets shall act solely pursuant to a contractual relationship on an arm's length basis.

*Confidentiality.* The Company further acknowledges that any service, information or advice, including the Opinion, provided by CIBC World Markets to the Company in connection with this engagement is for the confidential use of the Board of Directors and senior management of the Company and, except as contemplated by this letter agreement, may not be disclosed or referred

3

to publicly or to any third party, without our prior written consent, which consent will not be unreasonably withheld.

CIBC World Markets will treat confidentially any material non-public information relating to the Company provided by the Company to CIBC World Markets during this engagement, except as (a) required in order to perform our services under this engagement, including disclosing such information as necessary to its officers, employees, agents and other representatives who agree or are otherwise required to treat confidentially such information, (b) such information becomes publicly available other than by disclosure by CIBC World Markets in violation of the terms hereof or (c) otherwise required by law or judicial or regulatory process.

*Conflicts.* The Company acknowledges that CIBC World Markets and its affiliates may have and may continue to have investment banking and other relationships with parties other than the Company pursuant to which CIBC World Markets may acquire information of interest to the Company. CIBC World Markets shall have no obligation to disclose such information to the Company or to use such information in connection with any contemplated transaction. Nothing in this section shall relieve CIBC World Markets of its obligations set forth in the section entitled "Confidentiality".

*Anti-Money Laundering.* To help the United States government fight the funding of terrorism and money laundering activities, the federal law of the United States requires all financial institutions to obtain, verify and record information that identifies each person with whom they do business. This means we must ask you for certain identifying information, including a government-issued identification number (e.g., a U.S. taxpayer identification number) and such other information or documents that we consider appropriate to verify your identity, such as certified articles of incorporation, a government-issued business license, a partnership agreement or a trust instrument.

*Miscellaneous.* This letter agreement will be governed by and construed in accordance with the laws of the State of New York applicable to agreements made and to be fully performed therein. The Company irrevocably submits to the jurisdiction of any court of the State of New York located in the City and County of New York or in the United States District Court for the Southern District of New York for the purpose of any suit, action or other proceeding arising out of this letter agreement or our engagement hereunder.

Each of the Company and CIBC World Markets hereby waives any right it may have to a trial by jury in respect of any claim brought by or on behalf of either party based upon, arising out of or in connection with this letter agreement, our engagement hereunder or the transactions contemplated hereby.

The Company represents and warrants to CIBC World Markets that there are no brokers, representatives or other persons which have an interest in compensation due to CIBC World Markets from any Transaction or our services contemplated herein.

CIBC World Markets may, with the Company's consent (which consent will not be unreasonably withheld) and at its own expense, place announcements or advertisements in financial newspapers and journals describing our services hereunder upon consummation of the Transaction.

This letter agreement may not be amended or modified except in writing signed by the Company and CIBC World Markets and may be executed in two or more counterparts, each of which will be deemed to be an original, but all of which will constitute one and the same agreement. All rights, liabilities and obligations hereunder will be binding upon and inure to the benefit of the Company, CIBC World Markets, each Indemnified Party (as defined in Annex A) and their respective successors and assigns.

Please confirm our mutual understanding of this engagement by signing and returning to us the enclosed duplicate copy of this letter agreement. We are pleased that you have engaged us to act as your financial advisor and are looking forward to working with you on this assignment.

Very truly yours,

CIBC WORLD MARKETS CORP.

By:

Mark W. Henkels
Managing Director

Agreed to and accepted as
of the above date.

METAL MANAGEMENT, INC.

By:

Daniel W. Dienst
President & CEO

6

Metal Management, Inc.
Date: As of August 1, 2007

## ANNEX A: INDEMNIFICATION

The Company agrees to indemnify and hold harmless CIBC World Markets and its affiliates and their respective present and former directors, officers, employees, agents and controlling persons (each such person, including CIBC World Markets, an "Indemnified Party") to the extent fully permitted by law from and against any losses, claims, damages and liabilities, joint or several (collectively, the "Damages"), to which such Indemnified Party may become subject in connection with or otherwise relating to or arising from any transaction contemplated by this letter agreement or the engagement of or performance of services by an Indemnified Party thereunder, and will reimburse each Indemnified Party for all fees and expenses (including the fees and expenses of counsel) (collectively, "Expenses") as incurred in connection with investigating, preparing, pursuing or defending any threatened or pending claim, action, proceeding or investigation (collectively, the "Proceedings") arising therefrom, whether or not such Indemnified Party is a formal party to such Proceeding, and in enforcing this letter agreement; provided, that the Company will not be liable to any such Indemnified Party to the extent that any Damages are found in a final non-appealable judgment by a court of competent jurisdiction to have resulted primarily from the gross negligence, bad faith or willful misconduct of the Indemnified Party seeking indemnification hereunder. The Company also agrees that no Indemnified Party will have any liability (whether direct or indirect, in contract, tort or otherwise) to the Company or any person asserting claims on behalf of the Company arising out of or in connection with any transactions contemplated by this letter agreement or the engagement of or performance of services by any Indemnified Party thereunder except to the extent that any Damages are found in a final non-appealable judgment by a court of competent jurisdiction to have resulted primarily from the gross negligence, bad faith or willful misconduct of the Indemnified Party.

If for any reason other than in accordance with this letter agreement, the foregoing indemnity is unavailable to an Indemnified Party or insufficient to hold an Indemnified Party harmless, then the Company will contribute to the amount paid or payable by an Indemnified Party as a result of such Damages (including all Expenses incurred) in such proportion as is appropriate to reflect the relative benefits to the Company and/or its stockholders on the one hand, and CIBC World Markets on the other hand, in connection with the matters covered by this letter agreement or, if the foregoing allocation is not permitted by applicable law, not only such relative benefits but also the relative faults of such parties as well as any relevant equitable considerations. The Company agrees that for purposes of this paragraph the relative benefits to the Company and/or its stockholders and CIBC World Markets in connection with the matters covered by this letter agreement will be deemed to be in the same proportion that the total value paid or received or to be paid or received by the Company and/or its stockholders in connection with the transactions contemplated by this letter agreement, whether or not consummated, bears to the fees paid to CIBC World Markets under this letter agreement; provided, that in no event will the total contribution of all Indemnified Parties to all such Damages exceed the amount of fees actually received and retained by CIBC World Markets under this letter agreement (excluding any amounts received by CIBC World Markets as reimbursement of expenses). Relative fault shall be determined by reference to, among other things, whether any alleged untrue statement or omission or any alleged conduct relates to information provided by the Company or other conduct by the Company (or its employees or other agents) on the one hand, or by CIBC World Markets, on the other hand.

The Company agrees not to enter into any waiver, release or settlement of any Proceeding (whether or not CIBC World Markets or any other Indemnified Party is a formal party to such Proceeding) in respect of which indemnification may be sought hereunder without the prior written consent of CIBC World Markets (which consent will not be unreasonably withheld), unless such waiver, release or settlement (i) includes an unconditional release of CIBC World Markets and each Indemnified Party from all liability arising out of

7

such Proceeding and (ii) does not contain any factual or legal admission by or with respect to any Indemnified Party or any adverse statement with respect to the character, professionalism, expertise or reputation of any Indemnified Party or any action or inaction of any Indemnified Party.

The indemnity, reimbursement and contribution obligations of the Company hereunder will be in addition to any liability which the Company may have at common law or otherwise to any Indemnified Party and will be binding upon and inure to the benefit of any successors, assigns, heirs and personal representatives of the Company or an Indemnified Party. The provisions of this Annex will survive the modification or termination of this letter agreement.