UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x

OPPENHEIMER & CO. INC.,

    Plaintiff,

-v-                                            No. 08 Civ. 3697 (LTS)(FM)

METAL MANAGEMENT, INC.,

    Defendant.

-------------------------------------------------------x

## MEMORANDUM OPINION AND ORDER

Oppenheimer & Co. Inc. ("Plaintiff" or "Oppenheimer") brings this action against Metal Management, Inc. ("Defendant" or "Metal"), asserting a single cause of action for breach of contract. The parties have each filed a motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. The Court has jurisdiction of this action pursuant to 28 U.S.C. § 1332. The Court has reviewed thoroughly and considered carefully the parties' extensive submissions. For the following reasons Plaintiff's motion for summary judgment is granted in part and denied in part, and Defendant's motion for summary judgment is granted in part and denied in part.

### BACKGROUND

The following facts are undisputed except as otherwise indicated.[1]

---

[1] Facts characterized as undisputed are identified as such in the parties' statements pursuant to Local Civil Rule 56.1 or drawn from evidence as to which there is no non-conclusory contrary factual proffer. Citations to the parties' respective S.D.N.Y. Local Civil Rule 56.1 statements ("___ 56.1 St.") and responses thereto ("___ 56.1 Resp. St.") incorporate by reference citations to the underlying evidentiary submissions.

CIBC's Financial Advisory Work for Metal

In April 2007, CIBC World Markets Corp. ("CIBC") began performing work for Defendant in connection with a possible merger or other business combination with Sims Group Ltd. ("Sims"), an Australian company. (Pl.'s 56.1 St. ¶ 10.) From April 2007 to September 2007, Defendant and CIBC were involved in "extensive discussions" with Sims and its financial advisor regarding financial information relating to Metal and Sims as well as various configurations of a potential transaction between the companies, which CIBC helped Metal to evaluate. (Id. ¶¶ 31-34; see also Decl. of Christopher P. Malloy ("Malloy Decl.") Ex. 4 ("Proxy St.").) During this period CIBC, led by managing director Mark Henkels ("Henkels"), performed a number of strategic, financial, and other analyses relating to the transaction. (Pl.'s 56.1 St ¶ 45.) In July, August, and September 2007, CIBC made five presentations to Metal's Board of Directors, including discussion of the terms of a July 27, 2007, proposal by Sims and of Metal's response (id. ¶ 38), discussion of the terms of a revised proposal from Sims and of Metal's further counter-proposal (id. ¶ 39), summarization of due diligence conducted by various experts, including CIBC (id. ¶ 40), analysis of the impact of changing stock values and currency exchange rates on the merger's exchange ratio, premium for Metal stockholders, and their resulting pro forma equity ownership in Sims (id. ¶¶ 38-43), and finalization of the agreement with Sims (id. ¶ 43). The main point of contention between Metal and Sims appears to have been the exchange ratio – the number of Sims ADS, or American Depository Shares, to be issued in exchange for each outstanding share of Metal common stock – with Sims offering an exchange ratio of 2.0 while the Metal Board desired a ratio of 2.1. CIBC ultimately negotiated an exchange ratio of 2.05 with Sims's financial advisor. (Id. ¶¶ 47-48.)

CIBC and Metal negotiated the terms of an engagement letter (the "Engagement

Letter") over a period of almost four months, culminating in the execution of the Engagement Letter by CIBC and Metal on September 13, 2007. (Pl.'s 56.1 St. ¶¶ 11-12; Def.'s 56.1 Resp. St. ¶ 12.) The Engagement Letter, which is dated "As of August 1, 2007" (Malloy Decl. Ex. 5 ("Engmt. Ltr.")), provides for "the engagement of CIBC . . . by Metal . . . to act as exclusive financial advisor . . . in connection with a possible (a) merger . . . or (b) sale or other transfer . . . of the assets or securities of Metal . . . ." (Engmt. Ltr. at 1 (defining such a transaction as "the 'Transaction'").) CIBC committed to provide Metal with "financial advice and assistance," assist in the preparation of various documents, and to "render an opinion as to the fairness, from a financial point of view, . . . of the consideration to be paid" in connection with the transaction. (Id.) In exchange for these services, Metal agreed to pay CIBC an engagement fee of $50,000, a fee of $750,000 in the event Metal requested and CIBC provided a fairness opinion,[2] and a transaction fee of 0.5% of the "Transaction Value" of any Transaction or agreement resulting in a Transaction occurring during or within nine months of the termination of the engagement (the "Transaction Fee"), as well as to reimburse CIBC for its expenses.[3] (Id. at 2-3.) The Engagement Letter provided that the engagement would "terminat[e] 30 days from the date on which a party [to the Engagement Letter] receive[d] written notice from the other party of termination of th[e] engagement." (Engmt. Ltr. at 3.) No such termination would, however, affect Metal's obligation to satisfy its fee payment obligations under the agreement. (Id.) The

---

[2] CIBC provided such an opinion on September 24, 2007. (Pl.'s 56.1 St. ¶¶ 49, 86.)

[3] Defendant's consent was required for expenses in excess of $75,000. Plaintiff seeks reimbursement of expenses in the amount of $72,595.90, representing legal fees incurred in connection with the services rendered pursuant to the engagement letter. (Pl.'s 56.1 St. ¶ 103.) Curiously, Defendant disputes Plaintiff's statement of this expense, but concedes that a fee of "approximately $72,000" was incurred for legal services in connection with the fairness opinion that CIBC furnished pursuant to the Engagement Letter. (Def.'s 56.1 Resp. St. ¶ 103.)

parties agree that the Transaction Value of the Metal-Sims merger was $1,604,700,000.

The Engagement Letter also provided that CIBC would "treat confidentially any material non-public information relating to [Metal] provided by [Metal] to [CIBC] during this engagement, except as (a) required in order to perform [its] services under this engagement, including disclosing such information as necessary to its officers, employees, agents and other representatives . . . ." (Def.'s 56.1 St. ¶ 26; Engmt. Ltr. at 4.) Metal likewise agreed not to disclose any information or advice provided to it by CIBC in connection with the engagement without CIBC's consent. (Engmt. Ltr. at 3-4.)

The Engagement Letter also contains an indemnification clause which provides, in relevant part, that Metal will reimburse CIBC for "any losses, claims, damages and liabilities" to which it is subjected "in connection with or otherwise relating to or arising from any transaction contemplated by this letter agreement or the engagement of or performance of services by [CIBC] thereunder," and all expenses, including expenses of counsel, "incurred in connection with investigating, preparing, pursuing or defending any threatened or pending claim, action, proceeding or investigation . . . arising therefrom, . . . and in enforcing this letter agreement." (Engmt. Ltr. at 7.) The Engagement Letter provides that it is to be "governed by and construed in accordance with the laws of the State of New York applicable to agreements made and to be fully performed therein" (id. at 4), and that it may amended or modified only in writing (id. at 5).

On September 24, 2007, CIBC made a sixth presentation to Metal's Board of Directors, at which CIBC reviewed its financial analysis and its opinion that the terms of the proposed merger were fair, from a financial point of view. (Id. ¶ 49.) Metal's Board of Directors approved the merger that same day. (Id. ¶ 50.) Metal's stock price rose to a record high following the announcement of the merger agreement with Sims in September 2007.

(Def.'s 56.1 St. ¶ 38.) However, Metal's stock price declined in the fourth quarter of 2007 and throughout January of 2008. (Id. ¶¶ 39-40, 111.)

In the period between the execution of an agreement and the closing of a transaction, failure of shareholders to approve the proposed deal, a rival offer, and a myriad of other possible factors could jeopardize consummation of the transaction. (Id. ¶¶ 46-48; Aff. of Daniel W. Dienst ("Dienst Aff.") ¶ 33.) While no evidence has been proffered that any of these types of events occurred with respect to the Metal-Sims merger, Daniel Dienst, Metal's chief executive officer (Def.'s 56.1 St. ¶ 16), claims that he was concerned after the merger agreement was signed "about Metal's falling stock price" and the possibility that "a number of disgruntled shareholders" would vote against the merger with Sims. (Def.'s 56.1 St. ¶ 106.) On November 28, 2007, Dienst forwarded to Henkels an email he had originally sent to Sims's chief executive officer expressing consternation about the possibility that T. Rowe Price, which owned 8% of Metal shares, would vote against the merger as a result of the decline in value of Metal stock at the time. (Def.'s 56.1 St. ¶¶ 107, 109.)

Dienst asserts that he was also "concerned about interloper threats" from Nucor Corporation and Steel Dynamics Corporation ("SDC"), two steel processing "mini-mills," the latter of which announced in October 2007 that it was in the process of acquiring one of Metal's direct competitors (Def.'s 56.1 St. ¶¶ 87-88, 92-93), suggesting a possible interest by the mini-mills in acquiring their own scrap metal providers in order to realize efficiencies (see Henkels Dep. at 347:11-356:20, 360:13-25 (discussing Nucor's possible interest in "vertical integration" by acquiring Metal and noting SDC's acquisition of Metal's competitor as an example of a steel

producer "vertically integrat[ing]")[4].) Had Nucor made a bid for Metal, Metal would have been required to evaluate the bid in order to determine whether it was more favorable to its shareholders, and would have needed CIBC's and Henkels's financial advice and assistance in order to properly analyze the bid's comparative value. (Def.'s 56.1 St. ¶¶ 104-05; see also Henkels Dep. at 356:12-20.) No such bid was, however, made.

Oppenheimer Acquires CIBC's Domestic Investment Banking Business

On November 4, 2007, CIBC announced that it had agreed to sell its domestic investment banking business to Oppenheimer. (Pl.'s 56.1 St. ¶¶ 2, 51; Def.'s 56.1 St. ¶ 78; Malloy Decl. Ex. 2.) That same day, Henkels informed Dienst of the sale announcement. (Pl.'s 56.1 St. ¶ 52.) On November 20, 2007, Dienst sent an email to Henkels expressing "amazement and candidly some concern about the recent transaction whereby CIBC divested CIBC World Markets Corp. in the U.S. to Oppenheimer," and requested "[Henkels's] and Oppenheimer's assurances that [Henkels] will be there to see this deal across the finish line." The email continued: "Accordingly, please amend our engagement letter to include a 'key man' provision relating to your employment by CIBC World Markets (now owned by Oppenheimer and whatever re-branded as)." (Pl.'s 56.1 St. ¶ 54; Def's 56.1 St. ¶ 80.) The Engagement Letter was not amended to include a "key man" provision (Pl.'s 56.1 St. ¶ 55; Def.'s 56.1 Resp. St. ¶ 55), and there is no evidence that the subject was ever raised again.[5] The transaction between CIBC and Oppenheimer became effective on January 14, 2008. (Id. ¶ 56.)

---

[4] Nucor announced in February 2008 that it had acquired another company, which Nucor stated would permit it to "expand its direct ownership in the steel scrap supply chain." (Def.'s 56.1 St. ¶ 96.)

[5] At his deposition, Dienst did not recall receiving a response to his request for a "key man" provision. (Malloy Decl., Dienst Dep. at 40:2-7.)

Henkels has had extensive experience in the metals and mining industries – and in Metal's industry, metal recycling, in particular. (Def.'s 56.1 St. ¶¶ 50-51.) He was also familiar with Metal and had worked with Dienst when the latter was employed at CIBC. (Def.'s 56.1 St. ¶¶ 52, 66; Pl.'s 56.1 Resp. St. ¶ 52.) Dienst claimed at his deposition and in his affidavit in support of Metal's motion for summary judgment that Metal hired CIBC as its financial adviser because of Henkels's particular knowledge of Metal's business and industry. (Def.'s 56.1 St. ¶¶ 53-55, 68.) Both Henkels and Joel Rathbun, then an executive director at CIBC and the "number two CIBC banker working on the proposed [m]erger" between Metal and Sims (Def.'s 56.1 St. ¶ 58), left CIBC for another firm shortly before the January 14, 2008, closing of the Oppenheimer acquisition (Pl.'s 56.1 St. ¶ 57; Def.'s 56.1 St. ¶¶ 131-32).

The sale of CIBC's investment banking business to Oppenheimer was effectuated pursuant to an "Amended and Restated Asset Purchase Agreement by and among Oppenheimer Holdings Inc.[,] Oppenheimer & Co. Inc.[,] Canadian Imperial Bank of Commerce[,] CIBC World Markets Corp.[,] and Certain Other Affiliates of Canadian Imperial Bank of Commerce and Oppenheimer Holdings Inc. Identified Herein." (Malloy Decl. Ex. 35 (the "Asset Purchase Agreement" or "APA").) The APA is governed by New York law. (APA § 13.11(a).) Pursuant to Section 2.01 of the APA, Oppenheimer purchased CIBC's "entire right, title and interest in and to [certain assets] used solely or primarily in[] the Transferred C Businesses, including . . . (d) . . . the Assigned Engagements, including those identified on Schedule 2.01(d); and . . . all Assigned Engagement Receivables outstanding as of or arising following the Initial Closing Date[6] . . . , including those identified as such on Schedule 2.01(d)" and "(e) . . . all of [CIBC]'s

---

[6]   The Initial Closing Date was the date of the closing of the acquisition by Oppenheimer of, among other things, the CIBC assets relevant to this action. Other

rights, title and interest in and to all engagement letters . . . in respect of the Assigned Engagements . . . including those set forth on Schedule 2.01(e), and any other Contracts relating solely or primarily to the Transferred C Businesses ( . . . the 'Assigned C Contracts')." (APA § 2.01.) These assets are referred to as the "Purchased C Assets." (Id.) The Engagement Letter is not listed on Schedule 2.01(d) or Schedule 2.01(e). (See APA Ex. A at OPP 403-07.)

The "Transferred C Businesses" are defined to include CIBC's "U.S. investment banking business, including mergers and acquisitions and restructuring" (APA § 1.01 at 17); the term "Assigned Engagements" is defined to "mean[] (I) all Engagements which, as of the Initial Closing Date . . . , have not been fully and finally performed by [CIBC], and (ii) all Completed Assigned Engagements . . . together with . . . all benefits and obligations thereunder . . ." (id. at 3); an "Engagement" is defined as "any engagement or retention accepted or undertaken as part of the Transferred C Businesses by or on behalf of a third party, in respect of any financial advisory, investment banking, . . . or other services performed by the Transferred C Businesses . . ." (id. at 6-7); "Completed Assigned Engagements" are defined as "all Engagements with respect to which all services to be rendered by [CIBC] have been fully performed as of the Initial Closing . . . , [and] with respect to which Assigned Engagements Receivables remain outstanding or . . . the applicable [Engagement] contains rights of [CIBC] to . . . compensation . . . with respect to future events" (id. at 6); and "Assigned Engagement Receivables" are defined to include Fee Income, which is "all amounts received by [Oppenheimer] from third parties constituting compensation for services performed pursuant to Assigned Engagements, including fees and commissions . . ." (id. at 3, 8).

---

closing dates were contemplated in relation to assets not at issue here. (See APA §§ 2.09 and 2.10.)

Among the representations and warranties made by CIBC to Oppenheimer (see APA Art. V, preamble), was the representation that "Section 5.10(a) of the Seller Disclosure Schedule sets forth a complete and accurate list of all material Contracts to which [CIBC] is a party" and which relate to the Purchased C Assets, specifically including all Assigned C Contracts. (APA § 5.10(a).) Section 5.10(a) of the Seller Disclosure Schedule, which incorporates by reference, among other things, Schedule 2.01(e) to the APA, does not list the Engagement Letter. (See Kavanagh Decl. Ex. F ("Seller Discl. Sched.") at 42-67.)

The APA provides that, to the extent that the "sale, assignment, conveyance, or transfer of any Purchased C Asset," including an Assigned C Contract, requires the consent of a third party, and if such a transfer would constitute a breach or violation of the Purchased C Asset or adversely affect Oppenheimer's rights thereunder, then the APA does not constitute such a transfer. (APA § 2.07(a).) In such a case, CIBC undertook to attempt to obtain the third party's consent. (Id.) If such consent could not be obtained, CIBC further undertook to arrange for Oppenheimer to receive the benefits of the asset in question as though the required consent had been obtained. (Id.)

The Seller Disclosure Schedule to the APA provides that "[c]onsent of the applicable counterparty will be required to assign the confidentiality and nondisclosure agreements to which [CIBC is] a party and that are to be assigned pursuant to the [APA] and to transfer the confidential information or materials that are the subject of such agreements." (Seller Discl. Sched. § 5.02(b)(2).) Metal contends that CIBC disclosed Metal's confidential information to Oppenheimer without Metal's consent. (Def.'s 56.1 St. ¶¶ 30, 230.)

<u>Metal Request for Henkels's Assistance; Henkels Leaves CIBC</u>

On the afternoon of Friday, January 11, 2008, Dienst sent an email to Henkels,

which he copied to Rathbun, asserting that he had been "trying to reach [Henkels]," that he had a "big meeting" with T. Rowe Price the following Monday, that T. Rowe Price had told Dienst that it would vote against the merger in light of the recent decline in Metal's stock price and that Dienst needed to "turn them around," and that Dienst needed "updated books, models, comps. etc." in connection with that effort. (Def.'s 56.1 St. ¶ 129; Dienst Aff. Ex. H.) Henkels and Rathbun, who had taken positions at another firm starting Monday, January 14, 2008, did not respond by email (Def.'s 56.1 St. ¶ 141), although Dienst had brief telephone conversations with Henkels on January 11 minutes before sending the email and on the morning of January 14, 2008 (Pl.'s 56.1 Resp. St. ¶ 141; Malloy Decl. Ex. 62). Robert Larry, Metal's chief financial officer, attended the meeting at T. Rowe Price's offices in Baltimore on January 14, 2008, and perceived it as having been a "positive meeting" that "went well." (Kavanagh Decl. Ex. M ("Larry Dep.") at 95:8-25.) During a telephone call from Henkels to Dienst on January 15, 2008, Dienst "was very upset" and "rip[ped] [Henkels's] head off." (Def.'s 56.1 St. ¶¶ 145-47.) Dienst called Henkels the following day and asserted that he considered CIBC to be in breach of the Engagement Letter. (Id. ¶ 148.) The same day Henkels sent an email to his former boss at CIBC (now Oppenheimer), Marshall Heinberg, relating that Dienst "doesn't want to pay Oppenheimer the full fee" or even "much if anything." (Id. ¶ 149.) Heinberg called Dienst on January 23, 2008, and left a message. Dienst did not return the call. (Id. ¶¶ 152-53.)

Following the January 14, 2008, closing of Oppenheimer's acquisition of CIBC's investment banking business, there was little contact between Oppenheimer or its attorneys, Dewey & LeBoeuf LLP ("Dewey"), and Metal or its attorneys, King & Spalding LLP ("K&S"). On February 11, 2008, K&S sent an email to Dewey requesting its consent to the form of the fairness opinion, as required by the Engagement Letter (Engmt. Ltr. at 2), to be included in the

final Proxy/Registration Statement to be distributed to Metal stockholders. (Pl.'s 56.1 St. ¶ 71.) Dewey sent a copy of the fairness opinion to Metal's financial printer for inclusion in the Proxy/Registration Statement the same day. (Id. ¶ 76.) The Proxy Statement was filed on February 12, 2008 (id. ¶ 77; Malloy Decl. Ex. 4 ("Proxy")), and mailed to Metal stockholders on or about February 14, 2008 (Pl.'s 56.1 St. ¶ 79). On February 14, 2008, Metal's counsel informed Heinberg, now at Oppenheimer, that it deemed CIBC and/or Oppenheimer to be in breach of the Engagement Letter. (Pl.'s 56.1 St. ¶ 83; Def.'s 56.1 Resp. St. ¶ 83.) On March 13, 2008, CIBC's general counsel, Achilles M. Perry, sent a letter to Metal's counsel directing Metal to pay the Transaction Fee "in accordance with Oppenheimer's instructions" and stating that if Metal refused to do so then Metal was to pay the Fee to CIBC, which would "hold [it] for Oppenheimer's benefit." (Malloy Decl. Ex. 3 ("Perry Letter").) On March 14, 2008, it was announced that Metal's stockholders had approved the merger with Sims, which became effective that same day. (Pl.'s 56.1 St. ¶ 85.) The parties have proffered no evidence that a notice of termination was ever given in accordance with the Engagement Letter.

Oppenheimer seeks in this action to recover the Transaction Fee that it claims Metal owes in connection with the Metal-Sims transaction, expenses and fees incurred in connection with the engagement, prejudgment interest on these amounts, and attorney's fees incurred in connection with the litigation of this action.

### DISCUSSION

Summary judgment is to be granted in favor of a moving party if "the "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a)); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986) (the moving party bears the burden of establishing that there is no

genuine issue of material fact). A fact is considered material "if it might affect the outcome of the suit under the governing law," "and an issue of fact is a genuine one where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Holtz v. Rockefeller & Co. Inc., 258 F.3d 62, 69 (2d Cir. 2001) (quoting Anderson, 477 U.S. at 248). The Second Circuit has explained, however, that "[t]he party against whom summary judgment is sought . . . 'must do more than simply show that there is some metaphysical doubt as to the material facts. . . . [T]he nonmoving party must come forward with specific facts showing that there is a genuine issue for trial.'" Caldarola v. Calabrese, 298 F.3d 156, 160 (2d Cir. 2002) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986)). Similarly, "mere conclusory allegations, speculation or conjecture" will not suffice to defeat summary judgment. Cifarelli v. Vill. of Babylon, 93 F.3d 47, 51 (2d Cir. 1996); see also Fed. R. Civ. P. 56(e).

Metal contends that Oppenheimer has no enforceable rights under the Engagement Letter because the APA does not provide for the assignment of the Engagement Letter to Oppenheimer and the Engagement Letter is not assignable in any event. Oppenheimer argues that the Engagement Letter was transferred pursuant to the APA, and that at minimum the right to collect the Transaction Fee was transferred by the March 14, 2008, letter. Resolution of the parties' cross-motions for summary judgment thus turns on the interpretation of two contracts – the APA, which was an agreement between CIBC and Oppenheimer, and the Engagement Letter, which was an agreement between CIBC and Metal.

"[T]he threshold question in a dispute over the meaning of a contract is whether the contract terms are ambiguous." Krumme v. WestPoint Stevens Inc., 238 F.3d 133, 138 (2d Cir. 2000) (citation and internal quotation marks omitted). "If an agreement is 'complete, clear and unambiguous on its face[, it] must be enforced according to the plain meaning of its terms.'"

Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y., 375 F.3d 168, 177 (2d Cir. 2004) (alteration in original) (quoting Greenfield v. Philles Records, Inc., 98 N.Y.2d 562, 569 (2002)). Whether a contract is ambiguous and the meaning of an unambiguous contract are questions of law. Diesel Props S.r.l. v. Greystone Business Credit II LLC, 631 F.3d 42, 51 (2d Cir. 2011). The APA and the Engagement Letter are unambiguous in all relevant respects and, in light of the undisputed facts, the issues raised in this action can be resolved as a matter of law.

Oppenheimer's Rights under the Engagement Letter

The Engagement Letter is an Assigned C Contract

Metal contends that neither the Engagement Letter nor any right to receive payment arising therefrom was transferred to Oppenheimer pursuant to the APA. Metal argues that, in order for an asset to qualify as an Assigned C Contract under Section 2.01(e) of the APA, it must have been disclosed by CIBC on one of the schedules to the APA. Metal's interpretation of Section 2.01(e) does not square with the plain language of the provision. Section 2.01(e) of the APA defines the relevant group of assigned assets: the Assigned C Contracts. The APA defines Assigned C Contracts as all engagement letters, "including those set forth on Schedule 2.01(e)," that relate to Assigned Engagements.[7] Nothing in Section 2.01(e) purports to limit "all engagement letters" to merely "those set forth on Schedule 2.01(e)," and to read the word "including" to accomplish such a result in this context is simply untenable. Similarly, the representation by CIBC to Oppenheimer, in Section 5.10(a) of the APA, that all Assigned C Contracts are listed in certain disclosure schedules, and the requirement in Section 2.09(b)(ii)(c) of the APA that CIBC deliver to Oppenheimer assignments of the Assigned C Contracts, have no

---

[7] Metal does not dispute that the CIBC's 2007 engagement by Metal is an Assigned Engagement.

bearing on the definition of what constitutes an Assigned C Contract. Section 2.01 establishes that the Assigned C Contracts included all engagement letters relating to Assigned Engagements. CIBC's failures to list the Engagement Letter on certain disclosure schedules and to deliver an assignment of the Engagement Letter to Oppenheimer do not vitiate the Engagement Letter's status as an Assigned C Contract.

### CIBC's Assignment to Oppenheimer was Valid

Principally citing Sections 317 and 318 of the Restatement (Second) of Contracts and a line of cases relating to contracts based on personal trust and confidence, Metal further argues that the APA's purported assignment of the Engagement Letter was ineffective as a matter of law, because Metal's obligation to make payments under the letter was conditioned on performance of the services by CIBC, and in particular by Henkels, who had expertise concerning Metal's business. This argument fails on the plain terms of the Engagement Letter and the facts of this case.

The Engagement Letter conditions payment of the Transaction Fee with respect to the Metal-Sims merger, as to which Metal and Sims executed an agreement during the term of the Engagement Letter, solely on the closing of that transaction. The Engagement Letter does not specifically require any particular staffing by CIBC. Indeed, Metal's request for a modification to include a key man provision with respect to Henkels was denied by CIBC. Furthermore, it is undisputed that CIBC and Henkels actually did perform extensive advisory services, culminating in the execution of the merger agreement between Metal and Sims on September 24, 2007, after the August 1, 2007, effective date of the Engagement Letter. Finally, the Engagement Letter permitted either party to terminate the agreement on thirty days' notice without affecting Metal's obligation to pay the Transaction Fee and expenses. Thus, any

expectation on Metal's part that it had a right to demand continued performance of advisory services by CIBC through the closing of the transaction was inconsistent with the unambiguous terms of the Engagement Letter. Under these circumstances, CIBC's assignment of the Engagement Letter to Oppenheimer was not precluded and Metal's obligation to pay the Transaction Fee and expense reimbursement sought here survived the assignment of the Engagement Letter.

Breach of the Engagement Letter

Metal next argues that even if Oppenheimer did receive assignment of CIBC's rights to receive payment pursuant to the Engagement Letter, Metal is under no obligation to pay the Transaction Fee because CIBC or Oppenheimer materially breached the Engagement Letter. "[F]or an obligor's duties to be discharged on account of failed performance, the obligee's failure to perform must be material." Frank Felix Assocs., LTD v. Austin Drugs, Inc., 111 F.3d 284, 288 (2d Cir. 1997) (citing Restatement (Second) of Contracts § 281 cmt. b (1981)). "Under New York law, for a breach of a contract to be material, it must 'go to the root of the agreement between the parties.'" Id. at 289 (quoting Septembertide, Inc., 884 F.2d at 678).

The Engagement Letter is "complete, clear and unambiguous on its face;" the parties' rights can therefore be determined on this motion practice as a matter of law according to the Engagement Letter's plain meaning. See Eternity Global Master Fund Ltd., 375 F.3d at 177. The section entitled "Compensation" provides that Metal would pay, among other things, the Transaction Fee if the Metal-Sims merger, which was contracted for while the Engagement Letter was in effect, closed. "Where the occurrence of a condition is required by the agreement of the parties, rather than as a matter of law, the court will apply a rule of strict compliance." PaineWebber Inc. v. Campeau Corp., 670 F. Supp. 100, 105 (S.D.N.Y. 1986) (citing E.A.

Farnsworth, Contracts 544 (1982)). "New York courts have applied this rule in cases where an investment banking contract unambiguously provides for compensation upon the completion of a transaction and that transaction is consummated." Id. (citing cases) (granting summary judgment to financial advisor on claim based on fee arrangement nearly identical to the one at issue here).[8]

Nothing on the face of the Engagement Letter suggests that CIBC was required to perform any further services in order to be entitled to the Transaction Fee.[9] Indeed, as is noted above, the terms of the Engagement Letter are such that even if CIBC had terminated the engagement and thereby been released from any obligation to perform any further work, it would still have been entitled to payment of the Transaction Fee. As Metal's obligation to pay the Transaction Fee was conditioned only on the closing of the merger, and not on the further

---

[8] Metal attempts to distinguish PaineWebber Inc. on the ground that in that case the defendant failed to proffer any evidence that it had requested that PaineWebber perform any services. However, the failure to request services was deemed irrelevant to the determination of PaineWebber's entitlement to the "bonus payment," PaineWebber Inc., 670 F. Supp. at 102 (noting that a fee conditioned only on the closing of a transaction is "commonly known as a bonus payment"), because that fee, unlike several other fees contemplated in the agreement at issue there, was not "conditioned upon the rendering of services outlined in [the sections relating to the other fees]," id. at 106. The instant case involves a similar payment conditioned only on the closing of Metal-Sims merger. In any event, the only unmet request that Metal points to is CIBC's failure to respond to Dienst's Friday, January 11, 2008, afternoon email by the following Monday morning, and the evidence does not suggest that Metal suffered any adverse consequences as a result.

[9] This is in contrast to the $750,000 fee provided for in clause (b) of the "Compensation" section of the Engagement Letter, which was to be paid in return for a fairness opinion from CIBC. While Metal's arguments appeal to the notion that it would be peculiar for Metal to have agreed to pay CIBC the Transaction Fee without obtaining a return promise from CIBC to provide services, CIBC had in fact provided extensive services prior to the September 2007 execution of the Engagement Letter, which was by its terms made effective as of August 1, 2007. See N.Y. Gen. Oblig. L. § 5-1105 ("A promise . . . shall not be denied effect as a valid contractual obligation on the ground that consideration for the promise is past or executed, if the consideration is expressed in the writing and is proved to have been given or performed and would be a valid consideration but for the time when it was given or performed.")

performance of any task or service by CIBC or Oppenheimer, and the Metal-Sims merger actually closed, Metal is liable to Oppenheimer under the unambiguous Transaction Fee provision of the Engagement Letter. See also Deutsche Bank Securities, Inc. v. Rhodes, 578 F. Supp. 2d 652, 668 (S.D.N.Y. 2008) (holding that similar fee provision did not require investment bank to be involved in facilitating transaction in order to be entitled to fee, explaining that such an arrangement helps to ensure the exclusivity of the financial advisor's engagement, and noting that such arrangements are "not uncommon in the investment banking field"); CIBC World Markets Corp. v. TechTrader, Inc., 183 F. Supp. 2d 605, 611 (S.D.N.Y. 2001) (interpreting fee provision identical in all material respects to the one at issue here to "create[] an unambiguous duty on the part of [the defendant] to pay the fee if the stipulated Transaction occurs" because the provision "is written in the passive voice, thus demonstrating that there is no requirement that CIBC take any action at all to earn their fee"); Lazard Freres & Co. v. Crown Sterling Management, Inc., 901 F. Supp. 133, 137-38 (S.D.N.Y. 1995) (noting that fee obligations conditioned only on the closing of a transaction "are common" (citing PaineWebber Inc., 670 F. Supp. at 102)).

       Oppenheimer is therefore entitled to judgment in its favor in the amount of $8,023,262, representing the Transaction Fee of 0.5% of the Transaction Value, plus $72,595.90, representing its legal fees in connection with the preparation of the fairness opinion (which Metal does not dispute), for a total of $8,095,857.90. Oppenheimer is also entitled to prejudgment interest on this total amount at a rate of 9% per annum running from March 14, 2008, the date of the closing of the Metal-Sims merger, at which time the Transaction Fee came due. See N.Y. C.P.L.R. §§ 5001(a), 5004.

Attorneys' Fees

"Under the general rule in New York, attorneys' fees are the ordinary incidents of litigation and may not be awarded to the prevailing party unless authorized by agreement between the parties, statute, or court rule." Oscar Gruss & Son, Inc. v. Hollander, 337 F.3d 186, 199 (2d Cir. 2003). Such agreements between the parties "must be strictly construed to avoid inferring duties that the parties did not intend to create." Id. "Inasmuch as a promise by one party to a contract to indemnify the other for attorney's fees incurred in litigation between them is contrary to the well-understood rule that parties are responsible for their own attorney's fees, the court should not infer a party's intention to waive the benefit of the rule unless the intention to do so is unmistakably clear from the language of the promise." Hooper Assocs., Ltd. v. AGS Computers, Inc., 74 N.Y.2d 487, 492 (1989).

Thus, the Second Circuit interpreted an indemnification clause providing that the firm's client would reimburse the firm for any expenses incurred in connection with third-party claims "arising in any manner out of or in connection with the rendering of services by the Advisor hereunder (*including, without limitation, in connection with the enforcement of this Agreement* and the indemnification obligations set forth herein)," to exclude attorney's fees incurred in litigation between the parties to the agreement. Oscar Gruss & Son, 337 F.3d at 199 (emphasis in original). The parenthetical merely specified certain kinds of expenses that were included among those for which the client was required to indemnify the advisor, and the indemnification clause otherwise only covered expenses arising out of third-party actions, therefore expenses incurred "in connection with the enforcement of th[e] [a]greement" were only covered to the extent that they also arose out of third-party actions. Id. at 200 ("Examining the parenthetical language in light of the surrounding provisions, it can apply only to a situation

where [the client] refuses to indemnify [the advisor] from a third party action and not to an action commenced by [the advisor] against [the client].").

The indemnification clause at issue here provides that Metal will reimburse Oppenheimer (as CIBC's assignee) for all liabilities to which it is subjected "arising from any transaction contemplated by this letter agreement or the engagement of or performance of services by [CIBC or Oppenheimer] thereunder," and all expenses "incurred in connection with investigating, preparing, pursuing or defending" any claim or action "arising therefrom, . . . and in enforcing this letter agreement." This provision is not "exclusively or unequivocally referable to claims between the parties themselves" nor does it "support an inference that defendant promised to indemnify plaintiff for counsel fees in an action on the contract." Hooper Assocs., 74 N.Y.2d at 492. The indemnification provision speaks most clearly in terms applicable to third-party claims. The use of the word "pursuing" is not clearly inapplicable to such claims, insofar as a declaratory judgment claim, for instance, might be asserted in the context of a dispute with a third party. Similarly, the reference to "enforcing this letter agreement" can, as in Oscar Gruss & Son, logically be read to apply to enforcement of the provisions for indemnification in connection with third-party claims. Cf. United States Fidelity and Guar. Co. v. Braspetro Oil Services Co., 369 F.3d 34, 75 n.35 (2d Cir. 2004) (gathering cases involving indemnification provisions that the Court of Appeals "would deem to be 'unmistakably clear' in this regard"). The Engagement Letter's indemnification provision fails to make unmistakably clear that the parties intended to cover attorney's fees incurred in connection with litigation between them. Defendant is therefore entitled to summary judgment dismissing Oppenheimer's claim for its attorney's fees incurred in connection with this action.

In light of the foregoing resolution of the parties' cross-motions for summary

judgment, the Court need not address the parties' remaining arguments.

## CONCLUSION

Plaintiff's motion for summary judgment is granted with respect to its claims for the $8,023,262 Transaction Fee, the $72,595.50 in legal expenses incurred in connection with the preparation of the fairness opinion delivered in connection with the Metal-Sims merger agreement, and prejudgment interest on those amounts at the rate of 9% from March 14, 2008. Plaintiff's motion is denied insofar as Plaintiff seeks to recover its attorney's fees incurred in connection with this litigation.

Defendant's motion for summary judgment is granted insofar as it seeks dismissal of Plaintiff's claim for attorney's fees incurred in connection with this litigation, and is denied in all other respects.

This Memorandum Opinion and Order resolves docket entry nos. 59 and 65. The Clerk of Court is respectfully directed to enter judgment in Plaintiff's favor and against defendant for $10,477,370.95 and to close this case.

SO ORDERED.

Dated: New York, New York
  June 20, 2011

/s/ Laura Taylor Swain
LAURA TAYLOR SWAIN
United States District Judge